**E. G. KINGSBERY et al., Appellants,**

v.

**PHILLIPS PETROLEUM COMPANY**
**et al., Appellees.**

No. 10585.

Court of Civil Appeals of Texas.

Austin.

July 2, 1958.

Rehearing Denied July 30, 1958.

Tisinger & Sloan, Hollers & O'Quinn, Austin, for appellant.

Rayburn L. Foster, Harry D. Turner, Bartlesville, Okl., R. K. Batten, E. H. Brown, Houston, Black & Stayton, Austin, for appellees Phillips Petroleum Co., E. S. Nelson, J. P. Welch and R. D. Evans.

F. L. Kuykendall, Austin, for appellees John Beasley and Capitol City Oil Co.

HUGHES, Justice.

Appellants are E. G. Kingsbery, Everett D. Bohls, Ed D. Bridges and Reed-Phillips Oil Company, Inc.

Appellees are Phillips Petroleum Company, a private corporation, E. S. Nelson, J. P. Welch and R. D. Evans, employees of Phillips, and John D. Beasley and the Capitol City Oil Company, a private corporation.

Appellants' alleged cause of action is for damages for (1) breach of an oral contract entered into between Phillips and Kingsbery on or about February 22, 1955, orally amended January 16, 1956, whereby it was agreed that Kingsbery and his associates would have a jobber agency for the sale of Phillips' products in Austin for a period of twenty years from February 22, 1955; (2) alleged conspiracy of appellees to violate Art. 7428 Vernon's Ann. Civ.St. (Antitrust Act); (3) (alternatively) alleged tortious interference on the part of individual appellees to bring about a repudiation of the contractual relations

between Phillips and appellants and a conspiracy among all appellees to effect such repudiation; (4) alleged malicious interference on the part of appellee Beasley to bring about a breach of contractual relations between Phillips and appellants.

This case was tried to a jury which was unable to agree on a verdict and was discharged by the Court, following which the Court granted motions for judgment filed by appellees based primarily on their previously filed motions for instructed verdict.

We will view the evidence in a manner most favorable to appellants and will, for the most part, take our statement of the case from appellants' brief.

Prior to 1955, Phillips did not have any retail outlets for the marketing and sale of its products in Travis County, because it had no pipeline arrangement in this area. Such an arrangement was made in either the latter part of 1954 or the early part of 1955. Phillips desired a distributor for its products in this area with sufficient finances and experience to compete in a highly competitive market; that is, to pioneer the sale of Phillips products. After an investigation by Phillips, it was ascertained that Kingsbery had operated as a jobber in the retail of gasoline and other petroleum products for many years in Austin and had sufficient finances to establish a jobber agency. Numerous negotiations were had between representatives of Phillips and Kingsbery, which culminated in a written contract and contemporaneous oral agreements.

Orally it was agreed that Kingsbery would have a jobber agency for twenty years in the sale of Phillips' products at jobber prices and in such quantities as might be determined by the merchandizing requirements of Kingsbery as purchaser of Phillips' branded products.

Kingsbery also orally agreed to organize a corporation to be known as Reed-Phillips Oil Company and to finance its operations for the first three years in a sum of not less than $200,000.

It was further orally agreed between the parties that after Kingsbery had leased or built five filling stations, that Phillips would then come into Austin and match him station for station and dollar for dollar; the locations of stations to be built were to be determined by the parties and built according to Phillips' plans and specifications. The stations to be built by Phillips would be leased to Kingsbery or the corporation for twenty years. It being understood between the parties that it would take approximately twenty years to amortize the land and building costs of a new service station.

It was further orally agreed that Kingsbery would personally guarantee all of the obligations of Reed-Phillips Oil Company to Phillips Petroleum Company in the purchase of such products bought from Phillips and Phillips orally waived any right of cancellation of the jobber agency contract for a period of twenty years.

Phillips, acting through Nelson, its agent, represented that it never cancelled a jobber agency contract. This representation was shown to be false upon the trial of the case and that its falsity was known to Nelson at the time that it was made; further such representation was relied upon by Kingsbery as true, and he would not have invested the money he did nor accepted a jobber agency, but for such representations.

The evidence further shows that on or about February 22, 1955, the Phillips Petroleum Company entered into an agency instrument executed by Phillips on the one hand and by the Reed-Phillips Oil Company, Inc., signed by F. M. Reed, its president, on the other, although the Reed-Phillips Oil Company was not incorporated

until March 9, 1955.[1] This latter instrument Kingsbery testified he never saw prior to its execution. It provided for a sixty day cancellation notice and ran from year to year and was terminated by Phillips by letter dated January 30, 1956. Kingsbery testified that the written instrument dated February 22, 1955, was not nor was it intended to be the contract between the parties, that the oral agreement was the contract between them.

Within the first 12 or 13 months of the operation of said jobber agency, Kingsbery and his associates expended in connection with the agency, the sum of $198,852.10, and in reliance upon the good faith of Phillips and its representatives that he had a jobber agency for twenty years, Kingsbery and his associates expended more than $164,000 in the actual purchase of property, building a bulk plant, and constructing filling stations. All of such station sites, prior to their purchase, were approved by representatives of Phillips Petroleum Company. In one instance, on July 1, 1955, Phillips' agent, Nelson, suggested that Kingsbery buy a location for a station site on the Burnet Road costing the sum of $28,000. After this property was purchased, Nelson rejected this site and suggested that Kingsbery purchase another site, which he did.

Kingsbery and his associates also entered into leases for the following filling stations: On or about October 4, 1955, they acquired a lease on the premises at 214 Congress Avenue for a term of ten years and eleven months at a rental in excess of $60,000; at 11th and Red River Street on or about June 14, 1955, for a period of ten years at a rental in excess of $10,500; on May 25, 1956, on the premises on Burnet Road from Hilliare Nitschke for a term of fifteen years at rentals in excess of $63,000; at 2617 East 7th Street, a lease on part of the premises for twenty years at a rental in excess of $15,590; on June 1, 1955, a lease at 4014 South Congress Avenue for three years at a rental in excess of $6,300; at 8603 N. Lamar Blvd. on a month to month contract and agreed to pay rentals based on the gallons of gasoline sold; on May 1, 1956, a lease at 609 Airport Blvd. on a month to month basis, with rentals based upon the gasoline sold; in 1955, a station site on Barton Springs Road for a period of ten years at a rental in excess of $18,000; July 11, 1956, a lease on the filling station at 1811 Chicon Street for 12 months with rentals to be paid on the basis of the gallons sold.

In addition to the $198,852.10 expended by appellants during approximately the first year of operation as Phillips' jobber they became obligated to pay rentals over a period of twenty years in a sum in excess of $171,840.

Towards the latter part of 1955, Phillips Petroleum Company was not wholly satisfied with the operation of the jobber agency in Austin. Phillips' representative suggested capitalization of Reed-Phillips be raised from $25,000 to $50,000. Appellant Bridges was placed in charge of the Reed-Phillips

1. The written jobbership contract between Phillips and Reed-Phillips contains the following provisions:
"Period of Contract
"This contract shall be and remain in full force and effect for the primary term of one (1) year, beginning on April 1, 1955, and ending on March 31, 1956, and for successive periods of one (1) year thereafter unless and until either party shall notify the other in writing at least sixty (60) days prior to the expiration of the primary term or of any succeeding one-year period of its desire to terminate this contract, whereupon the contract shall terminate at the end of the yearly period in which the notice is given. The term 'contract year' as used herein shall mean the one-year primary term of this contract and subsequent one-year periods, if any, between the same dates."
Section 17 of the contract reads as follows:
"Entirety of Agreement
"This contract contains the entire agreement between the parties hereto, and there are no oral promises, agreements or warranties affecting it."

Oil Company as President, and Kingsbery purchased the stock of F. M. Reed in the corporation. The corporation capital was raised from $25,000 to $50,000 by amendment of charter on January 10, 1956.

At a meeting held at Kingsbery's office in Austin on January 16, 1956, in which Phillips Petroleum Company was represented by appellees, J. P. Welch and R. D. Evans, it was expressly agreed between Phillips and Kingsbery that if Kingsbery would complete a filling station on East 7th Street and also on the Burnet Road and purchase the property at 42nd and Lamar Streets, that when the construction of a station at that latter location was substantially under way, then Phillips would come in and build three stations at locations to be determined between the parties and according to Phillips' plans and specifications; such stations to be leased to Reed-Phillips Oil Company and to be amortized over a period of twenty years. The agreement between the parties provided that the three stations to be built by appellants would be completed during the year 1956. It was contemplated that in the future, after Kingsbery and Phillips had each built three stations, that thereafter the parties would match each other station for station and dollar for dollar.

The stations on East 7th Street and Burnet Road were completed, and both of those stations were formally opened on June 23, 1956, at which openings Phillips sent about fifteen or twenty representatives to aid in such openings. Kingsbery bought the property at 42nd and Lamar Blvd. at an expenditure of $22,500. Phillips also sent its engineers to Austin, and they prepared a plot plan for a jobber-built service station at 42nd and Lamar Blvd. in Austin, and on or about May 9, 1956, construction began.

After the meeting on January 16, 1956, no complaint was made by Phillips, either to Kingsbery or to his associates, as to their

manner of performing their contract. Under the management of Ed D. Bridges, Reed-Phillips Oil Company had completed its pioneering of Phillips' products and had in operation nine filling stations; had built two stations according to Phillips' plans and specifications; that is, Phillips' type stations; had purchased property for the location of a third station, and the company was showing a profit.

In addition thereto, Kingsbery and his associates and the Reed-Phillips Oil Company had obtained competent dealers for the operation of its nine stations.

In addition to building these stations, Kingsbery and his associates, at the suggestion of Phillips, were constantly looking for new locations and obtaining leases on additional stations, building up the commercial accounts for the company, and generally placing Phillips' products on the map in Austin and Travis County.

On July 14, 1956, Reed-Phillips wrote Phillips the following letter:

"The competetive situation here is causing some complications I feel you should know about. They are going around telling our customers and prospective customers that we are going to receive a letter about August or September 1st telling us that we are out of business. In spite of this we have picked up two nice commercial accounts and a filling station account of ten to twelve thousand gallons in the past ten days.

"We are enclosing herewith a signed request for a Philmatic Imprinter for the new station, which we will begin servicing Wednesday of the coming week. I will appreciate it if you will start this through the proper channels at your earliest convenience."

On July 19, 1956, Phillips sent Reed-Phillips the following letter:[3]

2. Phillips continued to supply Reed-Phillips with petroleum products notwith-

standing its prior termination of Reed-Phillips jobbership, January 30, 1956.

"This is to notify you that effective with the close of business August 18, 1956, Phillips Petroleum Company will cease to sell and/or deliver any of its products or merchandise to Reed-Phillips Oil Company, Austin, Texas.

"It is requested that you arrange for delivery to a representative of Phillips Petroleum Company on August 20th such advertising material as bears the Phillips Petroleum Company trademarks. Receipt for it will be given you."

On July 1, 1956, Phillips gave a jobbership to the Capitol City Oil Company owned by John Beasley, for the distribution of its products in Austin.

Appellants contend, from evidence which we will refer to later, that it is only reasonable to conclude that as a condition for taking such jobbership Beasley required Phillips to terminate its dealings with Reed-Phillips and that such evidence raises the issue of a conspiracy between Phillips, its named employees and Beasley and Capitol City Oil Company, the object of which was to cause Phillips to repudiate its business relationship with Reed-Phillips.

In their original petition appellants prayed as follows:

"Wherefore, Plaintiffs pray that immediately and without notice, this Court temporarily restrain the Defendants from in any manner discontinuing or causing to be discontinued the delivery of the petroleum products to Plaintiff corporation, and from doing any act calculated to cause the Sinclair Refining Company to discontinue such deliveries and that upon hearing a temporary injunction be granted in the same terms, and upon final hearing that such injunction be made permanent, and that Defendant Phillips Petroleum Company be enjoined to specifically perform the jobbership contract with Plaintiff corporation, and in the alternative Plain-

tiffs pray for the aforesaid damages, and all costs of suit and general relief."

On September 5, 1956, the trial court entered its order granting the temporary injunction prayed for by appellants, the pertinent language of such order reading as follows:

"It is therefore ordered, adjudged and decreed that the Clerk issue a temporary injunction restraining Defendants Phillips Petroleum Company, E. S. Nelson, J. P. Welch, and R. J. Evans from discontinuing the delivery of Phillips petroleum trademarked products or its other products or merchandise to Plaintiff Reed-Phillips Oil Company in the same manner as such deliveries have been heretofore made and are now being made, and from doing any act calculated to bring about any discontinuance or modification of such service, and from doing any act or suffering to remain outstanding any order calculated to suggest to or direct Sinclair Refining Company to fail to continue its service to Reed-Phillips Oil Company."

The temporary injunction remained in effect until November 4, 1957, when it was dissolved upon appellants' request, they having abandoned their prayer for specific performance.

During the period of more than one year, from September 5, 1956, to November 4, 1957, Phillips complied with the temporary injunction by supplying Reed-Phillips with more than one million gallons of gasoline, with large amounts of oil and other petroleum products, and with tires, batteries. and other accessories.

Appellants' fifteen points are mainly to the effect the Court erred in taking the case from the jury and rendering judgment because there was sufficient evidence to support a recovery upon the grounds alleged in their pleadings or that the Court. erred in taking such action because of the

incorrectness of various defenses interposed by appellees. Since the nature of these defenses is such that if one or more be sustained recovery by appellants is precluded we believe a primary consideration of appellees' counterpoints will be the best procedure in disposing of this appeal.

The Second and Third Counterpoints are that appellants by seeking and obtaining injunctive relief compelling specific performance of the contract for the breach of which they also sought damages have irrevocably elected to sue for specific performance of the contract and have waived their right to sue for damages for its breach.

We sustain this point.

In Seaman's Oil Co. v. Guy, 115 Tex. 93, 276 S.W. 424, 426, it is stated:

"The rule applicable to election is stated in 10 R.C.L. 703, 704, as follows:

" 'If one having a right to pursue one of several inconsistent remedies makes his election, institutes suit, and prosecutes it to final judgment or receives anything of value under the claim thus asserted, or if the other party has been affected adversely, such election constitutes an estoppel thereafter to pursue another and inconsistent remedy.' "

The Court there held that Lessors in an oil and gas lease who thereafter sued to cancel such lease for fraud were precluded from recovering the delay rentals deposited in a bank by Lessees the suit for cancellation having been dismissed just two weeks prior to the expiration of the lease. Damage to the leasehold estate by the pendency of the cancellation suit was held to bar the recovery of the delay rentals.

Norris v. Wilkins, Tex.Civ.App. Dallas, 3 S.W.2d 126, was a suit to foreclose a mortgage on a house and lot in which plaintiff had issued a writ of sequestration and the defendant replevied. Thereafter plaintiff procured the appointment of a receiver for the property. In dissolving the receivership the Court said:

"The doctrine seems to be well established that, where a litigant chooses between two or more different and coexisting modes of procedure allowed by law on the same state of facts, an election of a remedy results (9 R.C.L. p. 956, § 1), and when, as the result of action taken, an advantage is gained or a detriment occasioned, the litigant is estopped to pursue any other coexisting mode of procedure (9 R.C.L. p. 960, § 7; Jirou v. Jirou, Tex.Civ.App., 136 S.W. 493, 498; Johnson [Brinkman Commission] Co. v. Missouri-Pacific Ry. Co., 126 Mo. 344, 28 S.W. 870, 872, 26 L.R.A. 840, 47 Am.St.Rep. 675; Register v. Carmichael, 169 Ala. 588, 53 So. 799, 34 L.R.A.,N.S., 309, and notes).

"By suing out the writ of sequestration, plaintiffs secured protection against possible loss from an injury to or waste of the premises pending the determination of the suit, and conversely, appellant was occasioned a detriment, in that, in order to prevent being ejected, he was forced to replevy.

"Plaintiffs could have pursued either of the coexisting provisional remedies of having the property sequestrated (article 6840, § 3, Revised Statutes 1925), or could have had the same placed in the hands of a receiver (article 2293, § 2, Revised Statutes 1925), but, as these alternative statutory remedies are inconsistent with each other and not cumulative, when plaintiffs made choice of the procedure by sequestration, the remedy of receivership was no longer available (9 R.C.L., p. 958, § 3)."

It is obvious here that appellants benefited from and Phillips sustained injury by issuance of the temporary injunction.

Appellants thereby obtained, for more than a year, the right to sell Phillips' products, a right which the record shows to have been considered a very valuable right by all parties.

The detriment sustained by Phillips was in being compelled to retain a jobber it did not desire. The right to conduct business as one pleases is certainly a valuable right [3] and is one which the law protects if law, public policies and the rights of others are not violated.

We believe the doctrine of election of remedies is peculiarly applicable here because when appellants obtained injunctive relief there had been no actual breach of any contract, written or oral. At most there was only a threat to repudiate the contract in futuro. Such threat may be withdrawn leaving no cause of action even for nominal damages unless the party entitled to performance has manifested an election to rescind the contract or changed his position relying on the threat in such way as to make performance more burdensome. 5 Williston on Contracts, Rev.Ed., Sec. 1335, p. 3750–1.

It is plain that appellants did not treat the anticipatory breach of contract, evidenced by Phillips' letters of January 30, 1956 or July 19, 1956, as terminating the contract and authorizing a suit for damages for its breach. They insisted upon and obtained performance of the contract. This was a deliberate intentional abandonment of such anticipatory breach as cause for a suit in damages. Having thus elected to pursue the remedy of specific performance we do not believe that appellants having satisfied themselves by experience that performance is not desirable can at this late date change their course and sue for damages.

Closely related to the foregoing discussion under Counterpoints Two and Three is appellees' first counterpoint to the effect that the proof fails to show any damages suffered by appellants attributable to any act of any appellee.

Since there was no actual breach of any contract relied upon by appellants it is obvious that no damages could have resulted from a nonexistent breach. To overcome this hurdle appellants plead:

"Plaintiffs would further show, however, that in spite of the protection of such injunction, the Plaintiffs have been unable to operate with any great success for the reason that the uncertainty of Plaintiffs' operations under the protection of the Court's injunction has embarrassed the dealers operating under Plaintiffs' jobbership and has frightened Plaintiffs' dealers, and as a consequence of such uncertainty and fright several of Plaintiffs' dealers have already terminated their relationship with Plaintiffs, and at least one dealer has gone over to Capitol City Oil Company, and Plaintiffs say that they cannot reasonably and safely invest more capital at this time, in view of the circumstances, and likewise have been unable during the past year, while operating under the grace of the Court's injunction, to justify building or leasing more stations. Plaintiffs say that Defendants have, during the pendency of this law suit, combined their efforts to take away the customers of Plaintiffs' dealers and have by such combination forced Plaintiffs to go out of business, and Plaintiffs say that as a consequence, the prospect of future business for Reed-Phillips Oil Company is entirely hopeless, and Plaintiffs have lost over $75,-

---

3. "A person has an absolute right to refuse to have business relations with any person whomsoever, whether the refusal is based upon reason or is the result of whim, caprice, prejudice, or malice, * * *." Delz v. Winfree, 80 Tex. 400, 16 S.W. 111, 112.

000.00 as a direct and proximate result of said combination, and Plaintiffs have further lost anticipated profits from what would have been a twenty-year franchise, all as more fully hereinafter alleged."

Appellants also sought the recovery of $1,000,000 for lost profits and $500,000 exemplary damages.

This portion of appellants' pleading as well as other allegations of their petition reflect an attempt to plead damages as a result of the letter sent by Phillips on July 19, 1956, to Reed-Phillips, copied infra, advising that its products would not be supplied after August 18, 1956.

In order to sustain this theory of recovery the proof must at least show that the Reed-Phillips dealers knew of this letter and that as a result of such knowledge their business was adversely affected and a reasonable appraisal of such loss as a predicate for the assessment of monetary damages.

No dealer of Reed-Phillips nor any representative of such dealer testified in this case.

We quote from Phillips' brief:

"J. L. Braucher, Jr., a district sales representative for Phillips, testified that he informed certain of Reed-Phillips' dealers that Reed-Phillips was being notified that Phillips would discontinue supplying petroleum products to Reed-Phillips on August 18. Braucher so informed Shuler, Reed, Murphy and Cantwell; he did not so inform the other dealers handling Phillips products supplied them by Reed-Phillips."

We quote from appellants' Reply to Phillips' brief their entire argument on the damage issue:

"(Phillips, et al.) brief shows that Mr. Braucher, a district sales representative for Phillips, told several of our dealers that Phillips was going to cancel.

"Following that paragraph, appellees (Phillips, et al.) review portions of the evidence, and such portions show that after Braucher had made his rounds of the dealers: dealer cooperation lagged, Phillips' cooperation lagged also, some dealers quit, one at least went over to Capitol City, sales started dropping, one dealer went over to Sinclair, our president quit, the dealers were afraid, and the business demolished. On this appeal one ($1.00) dollar of damage is enough.

"The content of a rumor may be hearsay, but the fact that it exists is not. Braucher made his rounds; it is a fair inference he caused the rumors. The fact that they caused damage is illustrated by the undisputed drop in sales, and a jury should be allowed to consider the issue.

"The amount of damages was shown, among other evidence, by that of Mr. Bohls (a C.P.A.), who took Phillips' own amortization estimates of station income, reasonably to be expected in the future, and demonstrated $1,000,000.00 loss of profits, therefrom.

"Under the circumstances the 'anticipatory' breach caused damage. It was actionable, because it was a total repudiation of the contract. The temporary injunction—merely for the purpose (unavailing) of maintaining the status quo was not a renunciation of that repudiation. Phillips never renounced or repented from the repudiation. This was a total breach. 10-A Tex.Jur. 549."

The summation of the evidence in Phillips' brief, referred to by appellants is as follows:

Kingsbery testified that after this lawsuit was filed and the injunction obtained Reed-Phillips did not have "the same cooperation from [its] dealers" or "the same cooperation from Phillips"; that Reed-Phillips does not have "all of the deal-

ers that [it] had when that letter was written" and that some of them have "gone over to Capitol City"; that Reed-Phillips sales "have decreased a lot"; and that he is going to "liquidate the business,—salvage what [he] can."

On cross examination Kingsbery stated that only one dealer, Oliver Weed, had gone over to Capitol City; and that he knows of no "assistance that was requested * * * of Phillips" by Reed-Phillips that was denied by Phillips.

Bohls testified that after July 19, 1956, Reed-Phillips sales "started dropping"; that Reed-Phillips has not "had the same cooperation from [its] dealers" since July, 1956; that one dealer "started closing on Sunday"; that one dealer, Alf, who had been selling Sinclair products and who began selling Phillips products supplied by Reed-Phillips on July 10, 1956, returned to the sale of Sinclair products after the letter of cancellation went out; that a dealer by the name of Wiede left Reed-Phillips but another man was obtained for his place; that with the exception of Alf, who was a Reed-Phillips distributor for "just a few days in July," Reed-Phillips "had the same number of stations exactly" after the letter of cancellation went out and well into the year 1957 as it had prior thereto; that Bridges left the employ of Reed-Phillips about September 1, 1956, because "the business was falling off and the dealers wanting to quit and everything else."

On cross examination Bohls admitted that he personally did not know why the one dealer started closing on Sunday; that he had no personal knowledge of any lack of cooperation on the part of Reed-Phillips dealers; that his testimony concerning these matters was based upon what Bridges told him; and that, insofar as his personal knowledge went, all he knew was that sales volume of Reed-Phillips had dropped.

Bridges testified: "Well, the business had been practically abolished—demolished. After all these rumors that had gotten around the dealers lost confidence in us. We couldn't make any commitments." He testified that the dealers "wanted to know what the score was"; that he was not "able to give them any assurance"; and that the dealers "were afraid." Bridges testified that in his opinion "the situation was hopeless."

On cross examination Bridges testified that while Reed-Phillips lost some commercial accounts after the letter of cancellation went out, he did not know why the accounts were lost. He further said on cross examination that the "enthusiasm of the dealer" is important; and that of his own personal knowledge he didn't know how much effort was put forth by the dealers after July, 1956.

The testimony of Mr. Bohls, referred to in the excerpt from appellants' brief is to the effect that it was reasonable to anticipate that the net profit from the operations of thirteen stations for twenty years would exceed $1,000,000.

Appellees do not contend that there is insufficient evidence to warrant the recovery of some damages if there is any evidence upon which to base legal liability.

In Rios v. Lowenfield, Tex.Civ.App. El Paso, 289 S.W.2d 332, 334, writ ref., N.R. E., it is said that "While uncertainty as to the fact of legal damages is fatal to recovery, uncertainty as to the amount will not be." In support of this statement the Court cites Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097.

If actual breach of the contract were shown then some damages could be recovered as a matter of law. The gist, however, of appellants' suit is that Phillips sent a letter to Reed-Phillips threatening to terminate its jobbership and that knowledge of this letter on the part of dealers caused Reed-Phillips' loss.

The only evidence here is that some dealers knew of this letter and some dealers thereafter suffered declining business.

There is no evidence that the first was the cause of the latter.

In our opinion the essential element of causation is lacking—i. e. the proof of "legal damage" is too uncertain to authorize a recovery of any damages.

 We will next consider appellees' Sixth Counterpoint which is that the judgment rendered below should be affirmed because proof of the twenty year jobbership oral contract is prohibited by the parole evidence rule.

Appellants plead:

"(e) That it was further understood between the parties that E. G. Kingsbery and his associates would organize a corporation with which Phillips would sign a jobber agency instrument and through which corporation the jobber agency would operate, and to which all purchases would be invoiced.

"(f) That E. G. Kingsbery would personally guarantee all of the obligations of such corporation to Phillips Petroleum Company in the purchase of such products bought by it from Phillips.

"(g) That it was further understood between the parties that Phillips waived any right of cancellation of the jobber 'agency contract and that Kingsbery would have a permanent jobber agency for not less than twenty years from April 1, 1955."

The contract referred to in (e), supra, was executed and according to its terms, hereinabove quoted, was to remain in force for one year commencing April 1, 1955, and for successive one year periods subject to termination by either party upon 60 days notice given prior to the expiration of any contract year. Such contract also recited that it contained the entire agreement between the parties thereto and that "there are no oral promises, agreements or warranties affecting it."

Appellants have three answers to the application of the parole evidence rule (1) that the written contract of February 22, 1955, never became effective because it was "executed as a matter of form" (2) Kingsbery was not a party to such contract and hence the rule is inapplicable to him. (3) A new but similar oral agreement was made between the parties on January 16, 1956.[4]

Since Kingsbery was not a party to the written contract of February 22, 1955, we will examine first his contention that the parole evidence rule does not bar consideration of collateral agreements respecting the subject matter of the written agreement between Phillips and Reed-Phillips.

In our opinion there are two sufficient reasons for applying the parole evidence rule to exclude from the contract terms or agreements dehors the written instrument which arose before or contemporaneously with the execution of such contract (1) the parole evidence rule is a rule of substantive law which determines the operative facts of a given transaction which here is the determination of facts (agreements) constituting the contract between the parties to it [5] and this rule is applicable to third parties (2) Kingsbery was in such privity with the contract so as to make the parole evidence rule applicable to him.

As to (1) we content ourselves with the citation made in footnote 5 and the following quotations from eminent authorities:

"It is commonly said that the Parole Evidence rule, in the present aspect, is binding upon only those persons who are parties to the document. This form

4. In their main brief appellants dispose of the parole evidence rule by stating that it is inapplicable because the evidence raised fact issues on the issue of conspiracy. (10th point of error.)

5. See Texas Law of Evidence, McCormick & Ray, 2d Ed., Sec. 1601.

of statement suffices in most instances to reach correct results; but it is not sound on principle.

\* \* \* \* \* \*

"The truth seems to be, then, that the rule will still apply to exclude extrinsic utterances, even as against other parties, provided it is sought to use those utterances for the very purpose for which the writing has superseded them as the legal act." IX Wigmore on Evidence, 3d Ed., Sec. 2446, pp. 149, 150.

"The question has been raised whether the 'parole evidence rule' is applicable in favor of or against a third party who has not been a party to the written integration. The answer is definitely in the affirmative if the rule is correctly stated and understood. If two parties have by a complete written integration discharged and nullified antecedent negotiations between them, they are so discharged and nullified without regard to the identity of the person who may be asserting or denying the fact. If A has a claim for damages against B, and this claim is honestly discharged by a release or an accord and satisfaction, the operation of this discharge is not affected by the fact that it is C who afterwards asserts or denies it." Arthur L. Corbin, The Parole Evidence Rule, 53 Yale Law Journal 603, 661–662.

"One class of cases consists of those where, in a suit involving non-parties to the instrument, some oral agreement or understanding between the parties to the instrument variant from its terms is sought to be shown. If the purpose is to show intent where that is an issue, or if the instrument is not within the rule because a mere memorandum and not an embodiment of the transaction, there can be no objection,

but under similar circumstances the evidence would be admissible if the suit were between the original parties. But if the purpose be to show that the immediate legal effect of the transaction (such as a contract, or transfer of land or chattels) was different from that expressed in the embodying instrument, (as an agreement that a deed should convey different land from that described) then the Parole Evidence Rule would apply, even though the evidence is being offered by or against a person not a party to the instrument." 2 McCormick and Ray, Texas Law of Evidence, 2d ed., Sec. 1621, pp. 474–476.[6]

Appellants, including Kingsbery, plead that they "would organize a corporation with which Phillips would sign a jobber agency instrument and through which corporation the jobber agency would operate, and to which all purchases would be invoiced."

The corporation, Reed-Phillips, was formed and it executed the jobber contract with Phillips in the presence of Kingsbery who was its principal stockholder and who had represented it in the negotiations with Phillips.

No separate contract by which Phillips was to supply Kingsbery with its products is pleaded or proved. It is thus apparent that Kingsbery is relying, partially at least, upon the written contract and hence cannot contradict its terms. Van Sickle v. Watson, 103 Tex. 37, 123 S.W. 112.

It is our opinion that these facts bring Kingsbery within the decisions which hold that a third person, by participation therein, can become a party to a writing so as to preclude him from making any claim inconsistent with the writing under the parole evidence rule. Jackson v. Hernandez, 155 Tex. 249, 285 S.W.2d 184.

6. See this section in its entirety as to circumstances under which a stranger to a writing may be bound by or claim under oral agreements relating to the subject matter of the writing but not contained therein.

We quote from appellants' brief to show the basis of their contention that the writing of February 22, 1955, was executed for "form" only:

"Kingsbery testified that the agreement was for twenty years and that he was obligated to furnish $200,000.00 within three years, have five stations operating the first year and sign the guaranty contract. On the other hand, Nelson testified that Kingsbery was obligated to these things and also to reach 300,000 gallons within 90 days. None of these agreements appear in the instrument dated February 22, 1955, yet it is this instrument upon which defendants rely giving Phillips the right of cancellation.

"It is apparent that this instrument was not the agreement and not intended to be the written momorial of the transaction between the parties. Kingsbery so testified and Nelson in effect so testified. The only thing pertinent to the trade between the parties found in the instrument dated February 22, 1955, is the gallonage requirements. But these Mr. Nelson testified were not expected to be lived up to.

"Kingsbery testified that he had heard Nelson admit that the instrument dated February 22, 1955, did not contain the agreement between the parties. Nelson testified after Kingsbery as an adverse witness, and even though taken for 'cross-examination' by the attorney for Phillips Petroleum Company, made no attempt whatever to deny that he had admitted that the agreement was not contained in the written instrument. In this connection, Nelson testified that the letter dated February 7, 1955, written to him by F. M. Reed, was a part of the agreement between Phillips Petroleum Company and the Reed-Phillips Oil Company.

\* \* \* \* \* \*

"There can be no contract of any kind without an acceptance. Kingsbery has shown he did not accept the instrument of February 22, 1955. He did not sign it, he did not see it until after the law suit was started. The person who signed it on behalf of the 'corporation' did not testify and, of course, at the time he signed the instrument the 'corporation' on whose behalf he purported to act was not even in existence."

The writing here purports to be complete within itself and contains the recitation that it "contains the entire agreement between the parties hereto."

The law applicable here is well stated in Guarantee Life Ins. Co. v. Davidson, 234 S.W. 883, 884, Texas Commission of Appeals, as follows:

"A contract which has been reduced to writing, and imports on its face a complete expression of the whole agreement, without any uncertainty or ambiguity as to the object and extent of the engagement, must be taken as expressing the final views of the parties, as well as the full consummation of their undertaking. Milliken v. Callahan County, 69 Tex. 205, 6 S.W. 681.

"In the absence of fraud, accident, or mistake, parol evidence is inadmissible to vary, alter, or add to the terms of a written contract, clear in its terms, unless upon its face it in some manner rebuts the presumption that it is complete. This rule forbids the adding by parol where the writing is silent, as well as to vary where it speaks. Castro v. Illies, 13 Tex. 229; Gulf C. & S. F. Ry. Co. v. Jones, 82 Tex. 156, 17 S.W. 534; Sanborn v. Murphy, 86 Tex. 437, 25 S.W. 610."

See, also, Sec. 1602, McCormick and Ray, Texas Law of Evidence, 2nd ed.

In our opinion the Trial Court did not err in his presumed holding that the written contract contained the complete agreement between the parties thereto.

This brings us to a consideration of appellants' contention that on January 16, 1956, a new oral agreement was consumated.

We quote from appellants' brief:

"At a meeting held at Kingsbery's office in Austin on January 16, 1956, in which Phillips Petroleum Company was represented by Defendants, J. P. Welch and R. D. Evans, it was expressly agreed between Phillips and Kingsbery that his twenty year contract was confirmed and further that if Kingsbery would complete a filling station on East 7th Street and also on the Burnet Road and purchase the property at 42nd and Lamar Sts., that when the construction of a station at that latter location was substantially under way, then Phillips would come in and build three stations at locations to be determined between the parties and according to Phillips' plans and specifications; such stations to be leased to Reed-Phillips Oil Company and to be amortized over a period of twenty years. The agreement between the parties provided that the three stations to be built by Plaintiffs would be completed during the year 1956. It was contemplated that in the future, after Kingsbery and Phillips had each built three stations, that thereafter the parties would match each other station for station and dollar for dollar.

\*　\*　\*　\*　\*　\*

"The evidence in this case supports the allegations and contentions of Appellants that they have fully performed their oral contract growing out of the conferences leading up to the February 22, 1955 meeting between representatives of Phillips and Kingsbery, as amended by the agreement growing out of the conference of January 16, 1956. It is not disputed by any evidence in the case that there was an oral contract for twenty years growing out of the January 16, 1956, conference. At this meeting held in Kingsbery's office in Austin, Phillips Petroleum Company was represented by Defendants, Welch and Evans, both of whom were in attendance throughout the trial of the case, but neither took the witness stand to deny that such an agreement was made."

Kingsbery testified regarding this meeting as follows:

"Q. All right, sir. Now, I will ask you if it is not true that at that conference Mr. Evans told you that Phillips was terminating the year to year contract with Reed-Phillips Oil Company? A. Yes, sir.

"Q. All right. And he also stated that they would submit to you or you could have a thirty day contract? A. Yes, sir.

"Q. And following that, on January 30, 1956, the notice was sent to Reed-Phillips that the contract of February 22, 1955, was being terminated? A. I believe it was sent, but I didn't know it until after this suit was filed.

\*　\*　\*　\*　\*　\*

"Q. All right. Now, is all you said—when Mr. Evans told you that the year to year contract was going to be terminated, is all you said to him that you had a twenty year deal? A. Yes, sir.

"Q. Is that the sum and substance of all you said? What else did you say? A. I said that we would not accept any thirty day deal.

"Q. And you gave as a reason for it that you had a twenty year contract? A. Yes, sir.

\*　\*　\*　\*　\*　\*

"Q. Now, was anything said about twenty years at this conference? A. We talked about these stations, and that this would be part of our plan, these three stations would be part of—that they proposed to build, would be part of our twenty year deal.

"Q. The stations that who proposed to build? A. Phillips. On the completion of ours, they were to build three."

Again Kingsbery testified:

"Q. What is that interpretation based on?[7] What was said that gave you that idea? A. When Mr. Welch came up there and Mr. Evans on January 16, 1956, and Mr. Welch readily agreed that if we would go ahead and finish these two stations, after he had refused to go ahead and built at 42nd and Lamar, he said, 'Go ahead and finish those three, and then we will build three for you on a twenty year deal.' Well, I would certainly figure if I leased the stations for twenty years and paid them rent on them that time, there would be a twenty year deal.

"Q. That was merely a specific conversation about a phase of the dollar for dollar proposition, wasn't it? Isn't that what they were doing—matching you dollar for dollar? A. Matching me dollar, for dollar, yes, sir.

"Q. And they had agreed to match you dollar for dollar in the very beginning, and you say they agreed to match you dollar for dollar on February 22, 1955? A. And haven't done any of it yet.

"Q. Well, that is your understanding, anyway, wasn't it? A. Yes, sir, that they would match me dollar for dollar.

"Q. And your testimony now is that from the very beginning, from February 22, 1955, on, your understanding was that this twenty year period would begin as you acquired each new station on this dollar for dollar setup? A. Yes, sir."

Appellant Bridges testified as to the same meeting as follows:

"A. * * * I had been told, as I said before, that it was a long twenty year deal, and it was verified there that day. I don't remember the precise language that was used, but I got every impression of a twenty year contract there that day—that this was a permanent tie-up.

"Q. Did they say anything about cancelling out? A. No, sir, that was not mentioned to my knowledge.

"Q. Did they say anything about cancelling that one year instrument—that yellow paper? A. No, I don't recall that having come up.

"Q. What about a thirty day contract? A. Yes, it was mentioned.

"Q. What was said about that? A. Mr. Evans, after all the conversation had gone on for about two hours and twenty minutes, or two hours and a half, for a very short period of time Mr. Welch looked over at Mr. Evans and said, 'Bob, do you have anything to say?' And Bob said,—Mr. Evans said, 'I have this to say'—of course, I don't remember that conversation either precisely except, 'We are going to submit to you a thirty day contract,' and before he had gotten it out of his mouth good Mr. Kingsbery said, 'We are not going to operate under any thirty day contract. We have a long tenure here and we would rather operate without any written contract at all."

It is our opinion that the testimony of Kingsbery refutes the creation of a new contract at the January 16, 1956, meeting. The most the evidence shows is an implementation of the original oral agreement of February 22, 1955.

7. Kingsbery had testified that the twenty year oral contract applied separately to each station as it was completed.

Appellees advance two additional theories of defense upon which we do not deem it necessary to write. These are that the oral agreements relied upon by appellants are within the Statute of Frauds, Vernon's Ann.Civ.St. art. 3995, and that such agreements are unenforceable because of uncertainty of their terms.

Since we have held that the only oral agreement supported by evidence was merged into the written contract of February 22, 1955, it would needlessly extend this opinion to pass upon these defenses. We will say however that should the necessity arise these defenses merit very careful and studious consideration.

Appellees Beasley and Capitol City Oil Company have filed a separate brief.

The record shows that the Capitol City Oil Company was chartered July 9, 1956. It is also shown that Beasley did not make an appearance in the subject matter of this controversy until March 21, 1956, when Nelson (Phillips) discussed with him a jobbership contract and Beasley asked Nelson to cancel the Reed-Phillips contract but Nelson refused. This date was subsequent to Phillips' letter of January 30, 1956, to Reed-Phillips cancelling the contract of February 22, 1955.

Since we have held that the written contract of February 22, 1955, is the only enforceable contract established and since such contract was by its express language terminated by either party upon 60 days' notice, Phillips had the legal right to cancel and the other appellees had the legal right to persuade or attempt to persuade Phillips to exercise that right if a legitimate purpose of their own was served. Delz v. Winfree, Norman and Pearson, 80 Tex. 400, 16 S.W. 111; Restatement, Torts, Sec. 768.

Beasley was a business competitor of Reed-Phillips and it was entirely legitimate for him to persuade Phillips by lawful means to exercise its right to cancel the contract with Reed-Phillips and give the jobbership to him.

As before noticed it must also be remembered that Phillips did not actually breach any contract, oral or written, with Reed-Phillips.

The charge of conspiracy to interfere with the contractual rights of Reed-Phillips must, therefore, fail as also must the charge of conspiracy to violate the antitrust laws of this State.

A civil conspiracy was defined by this Court in Bartelt v. Lehmann, 207 S.W.2d 131, 132, writ refused:

"A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means."

In Arkansas Fuel Oil Company v. State, 154 Tex. 573, 280 S.W.2d 723, 730, an antitrust action, the Court stated: "As a practical matter, the only thing which can be enjoined is an illegal agreement," and again "An agreement to do acts which are themselves legal * * * is not enough."

There is no evidence here of any agreement on the part of appellees to do any illegal or wrongful act.

If it be said that the motive of appellees are bad the reply is that motives are immaterial under the rule that "If an act be lawful * * * an improper motive does not render it unlawful. * * * 'Malicious motives make a bad case worse, but it cannot make that wrong which, in its own essence, is lawful.'" Griffin v. Palatine Ins. Co., Texas Com.App., 235 S.W. 202, quoting from Bohn v. Hollis, 54 Minn. 223, 55 N.W. 1119, 1121.

The judgment of the Trial Court is affirmed.

Affirmed.